**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIFE STAR LIVING, LLC, LIFESTAR TALENT, LLC, LIFESTAR CAPITAL, LLC, DAVID BENJAMIN FALK, and JOEL LESLIE ANDERSON, | Case No.: 1:26-cv-4554 |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| YOEL GETTER, GOLD CAPITAL USA, LLC, MADISON GROUP, LLC, and DAVID A. JASKOWLSKI, | |
| Defendants. | |

Life Star Living, LLC, Lifestar Talent, LLC Lifestar Capital, LLC , David Benjamin Falk, and Joel Leslie Anderson ("Life Star"), (collectively, "Plaintiffs"), allege as against Defendants Yoel Getter, David A. Jaskowlski, Gold Capital USA, LLC, and Madison Group, LLC (the "Defendants" or "Enterprise") as follows:

## NATURE OF THE ACTION

1.      This action arises from a fraudulent scheme to collect unlawful debt.

2.      Defendants employed a classic "carroting" scheme that is plaguing the MCA industry and destroying small businesses across the country.

3.      The goal of this "carroting" scheme here was larceny.

4.      At the time of the scheme, Life Star had an existing MCA with the Enterprise that had a balance of $1,820,712.

5.      The MCA Agreement was taken out on April 7, 2026 with Gold Capital, and a payback of $2,175,000 but had an early pay discount addendum reducing the payback to $1,725,000 if paid within 30 days—a discount of $450,000.

6.      On or around May 1, 2026, Defendants devised a scheme where the Defendants conspired with another Enterprise Member, Madison Group, to charge Life Star an additional $1,100,000 in interest based on the "carrot" that Life Star would obtain the $450,000 early pay discount on the Gold Capital MCA.

7.      Defendants never intended to give the promised contractual discount and instead devised the scheme to steal $450,000 from Life Star, while charging Life Star an additional $1,100,000 through Madison Group.

8.      To be sure, the form of the MCAs is identical.

9.      As intended by this unlawful "carroting" scheme, the Enterprise charged Life Star the full original face amount, not the $450,000 discounted contractual balance and then refused to refund the amount overpaid by its other Enterprise Member Madison Group.

10.     The scheme also constitutes the collection of unlawful debt. *See People v. Richmond Capital Grp. LLC*, 246 A.D.3d 585, 586 (1st Dep't 2026) ("The subject agreements, although styled as MCAs, are properly characterized as loans subject to restrictions on usury…. Although the MCAs have mandatory reconciliation provisions, no reconciliation was performed in practice, even though it was supposed to be performed on a monthly basis, and daily payments were fixed and did not represent a good faith estimate of receivables; there is no persuasive evidence of any ad hoc incidents of reconciliation (upon a merchants' request), which were subject to respondents' "sole discretion," and there is evidence that such requests were denied; bankruptcy was an express event of default in some of the MCAs, but even where it was not, repeated nonpayment was, as was breach of the MCAs, which was the case where a merchant "interrupt[ed], suspend[ed], dissolve[d] or terminate[d]" its business; and in the event of any of these circumstances, the full uncollected amount became due and respondents were empowered to

enforce the personal guarantees they required the merchants to provide.") (citing *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 WL 3882697, *2 (2d Cir, June 8, 2023)).

11.     Plaintiffs seek compensatory damages, treble damages under RICO and applicable fraud, civil theft, breach of contract, punitive damages, attorneys' fees, costs, prejudgment interest, and all other relief the Court deems just and proper.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

13.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiff's federal RICO claims.

14.     Venue is proper in this District under 28 U.S.C. § 1391 because substantial events giving rise to the claims occurred in this District, including acts by Woods and his New York law firm, the use of New York legal services to further the scheme, communications directed from New York, and acts affecting Plaintiff's funds through Bank of America.

15.     Venue is further proper because Defendants Roderick D. Woods and Roderick D. Woods P.C. reside in or maintain their principal place of business in this District and conducted the acts complained of from this District.

## PARTIES

16.     Plaintiff Life Star Living LLC is a limited liability company organized under the laws of Florida, located at 3799 Cadbury Circle, #208, Venice, Florida 34293.  Its sole members are Plaintiffs Falk and Anderson.

3

17.    Plaintiff Lifestar Talent, LLC is a limited liability company organized under the laws of Florida, located at 3799 Cadbury Circle, #208, Venice, Florida 34293.  Its sole members are Plaintiffs Falk and Anderson.

18.    Plaintiff Lifestar Captial, LLC is a limited liability company organized under the laws of Florida, located at 3799 Cadbury Circle, #208, Venice, Florida 34293.  Its sole members are Plaintiffs Falk and Anderson.

19.    Plaintiff David Benjamin Falk is an individual citizen of Maryland.

20.    Plaintiff Joel Leslie Anderson is an individual citizen of Florida.

21.    Defendant Yoel Getter is an individual who resides at 9705 Collins Avenue, Unit 2403, Bal Harbour, Florida 33154 and conducts business through Riverside Capital NY LLC and related merchant-cash-advance entities.

22.    Defendant David A. Jaskowlski is an individual who resides at 1441 Robbins Lane, Seaford, New York 11783.

23.    Defendant Madison Group, LLC is a New York limited liability company with a registered agent located at 326 Madison Street, Suite 2d, New York, NY.

24.    Defendant Gold Capital USA, LLC is a New York limited liability company with a registered agent located at 90 State Street, Suite 700, Office 40, Albany New York 12207.

## FACTUAL ALLEGATIONS

25.     The Enterprise's purpose is to generate and collect unlawful debt by disguising loans as purchases of future receivables, imposing fixed weekly payments that bore no meaningful relationship to actual receivables, conditioning any reconciliation on onerous requirements and the absence of any claimed default, converting the purchased percentage to 100% upon default, imposing broad cross-collateralization and guaranties, and using repeated electronic

4

communications, ACH debits, wires, Docusign documents, payoff letters, balance-transfer letters, and collection demands to obtain funds from merchants.

26. Life Star's transactions with the Enterprise followed this unlawful pattern.

27. The Life Star transactions included the following agreements:

| Date | Funder | Merchant | Purchase Price | Purchased Amount | Payment Terms |
|---|---|---|---|---|---|
| 05/02/2025 | Gold Capital | Life Star Living LLC and listed entities | $2,000,000 | $3,000,000 | 40%; weekly $214,285.71 |
| 03/27/2026 | Gold Capital | Lifestar Talent LLC | $2,200,000 | $3,190,000 | 40%; weekly $106,333.33 |
| 03/30/2026 | Gold Capital | Lifestar Capital LLC | $1,500,000 | $2,175,000 | 40%; weekly $103,571.42 |
| 05/01/2026 | Madison Group | Life Star Living LLC | $2,750,000 | $3,850,000 | 20%; weekly $183,333.33 |

28. On or about March 27, 2026, Gold Capital entered into an MCA agreement with Lifestar Talent LLC. The stated purchase price was $2,200,000; the stated purchased amount was $3,190,000; the stated purchased percentage was 40%; and the weekly remittance was $106,333.33.

29. On or about March 30, 2026, Gold Capital entered into an MCA agreement with Lifestar Capital LLC. The stated purchase price was $1,500,000; the stated purchased amount was $2,175,000; the stated purchased percentage was 40%; and the weekly remittance was $103,571.42.

30. On or about March 30, 2026, Gold Capital also executed a prepayment-discount addendum for the Lifestar Capital LLC transaction. The addendum provided that if the transaction were paid within 30 calendar days, the rate would adjust to 1.15 and the payoff would be $1,725,000; if paid within 45 calendar days, the rate would adjust to 1.20 and the payoff would be

5

$1,800,000; and if paid within 60 calendar days, the rate would adjust to 1.25 and the payoff would be $1,875,000.

31.     Gold Capital's own payment history for Life Star reflected a starting balance of $2,175,000 on April 14, 2026 and showed that by May 4, 2026, after payments and returned ACH entries, the balance was $1,820,712.

32.     On or about May 1, 2026, Madison Group entered into a new MCA agreement with Life Star Living LLC. The stated purchase price was $2,750,000; the stated purchased amount was $3,850,000; the stated purchased percentage was 20%; and the weekly remittance was $183,333.33.

33.     On or about May 1, 2026, Madison Group issued or caused Life Star to execute a "Balance Transfer Agreement" concerning Lifestar Capital LLC. The letter stated that Life Star agreed to pay off the remaining RTR of $1,820,712 that existed on the previous Gold Capital merchant agreement entered into on or about March 30, 2026 from the funds Life Star was receiving from the new Madison Group merchant agreement dated May 1, 2026.

34.     By that balance-transfer document, Madison Group caused Life Star to authorize Madison Group to deduct $1,820,712 from the new Madison Group merchant agreement.

35.     The Madison Group transaction was therefore not a bona fide purchase of future receivables in the ordinary course. It was a refinancing or balance-transfer transaction designed to use new proceeds to pay off an existing Gold Capital debt, while adding approximately $1,100,000 in new charges under the Madison Group agreement.

36.     At the time Madison Group deducted $1,820,712 for Gold Capital, the March 30, 2026 Gold Capital transaction was within the period governed by the early-pay discount

6

addendum. The payoff should have been reduced to the discounted amount provided in that addendum to $1,370,712.

37.    The Enterprise instead caused Madison Group to deduct the full $1,820,712 balance for Gold Capital and failed and refused to give Life Star the benefit of the $450,000 early-pay discount or refund the overpayment.

38.    The Enterprise used the promised discount as the "carrot" to induce Life Star into the Madison Group transaction, while knowing or intending that Life Star would not receive the discount and that the Enterprise would collect the full undiscounted Gold Capital amount and the new Madison Group return.

39.    Because Madison Group and Gold Capital used substantially identical form documents, coordinated the payoff of the Gold Capital balance, and benefited from the same balance-transfer scheme, their conduct was not arms-length and independent. It was coordinated Enterprise conduct designed to extract additional unlawful debt from Life Star

40.    Despite defrauding Life Star, on or about May 2, 2025, Gold Capital attempted to induce Life Star Living LLC and related entities to enter into yet another MCA Agreement. The stated purchase price was $2,000,000; the stated purchased amount was $3,000,000; the stated purchased percentage was 40%; and the weekly remittance was $214,285.71.

41.    Life Star refused to do any further business with the Enterprise, and instead joined this lawsuit.

<u>**COUNT I**</u>
**Civil RICO — 18 U.S.C. § 1962(c)**

42.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

**A.      The RICO Persons and Enterprise Members**

43.     Getter, Jaskowlski, Gold Capital, and Madison Group are "persons" within the meaning of 18 U.S.C. § 1961(3).

44.     The Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

45.     The Enterprise had a structure, purpose, relationships among associates, and longevity sufficient to pursue its fraudulent and unlawful collection objectives.

46.     Getter, Jaskowlski, Gold Capital, and Madison Group conducted or participated in the conduct of the Enterprise's affairs.

47.     They did so through a pattern of racketeering activity, including acts indictable as wire fraud under 18 U.S.C. § 1343, bank fraud under 18 U.S.C. § 1344, mail fraud under 18 U.S.C. § 1341, interstate transportation or receipt of stolen or fraudulently obtained property, and related acts.

48.     They also conducted or participated in the enterprise's affairs through the collection of unlawful debt.

49.     The predicate acts included, without limitation:

    a.   the documents regarding the Gold Capital "early pay" discount and the solicitation documents regarding Life Star's transaction with Madison Group;

    b.   the use of interstate wires and ACH transactions to accomplish the schemes;

    c.   communications among Getter, Jaskowlski, Gold Capital, and Madison Group, and others to carry out or conceal the scheme; and

    d.   the collection of unlawful debt.

50. The racketeering acts were related because they had the same or similar purposes, participants, victims, methods, and results.

51. The racketeering acts posed a threat of continued criminal activity because the enterprise regularly engaged in merchant-cash-advance collection activities and used repeatable methods to extract funds from merchants.

52. Plaintiffs were injured in their business or property by reason of the RICO violations.

53. Plaintiffs' injuries include the loss of $450,000 by Life Star, the payment of criminally usurious interest by Plaintiffs, lost use of funds, consequential damages, attorneys' fees, and costs.

54. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, attorneys' fees, costs, and all other relief available by law.

**A.    The Roles of the Enterprise Members**

55. Getter functioned as the Enterprise's directing and supervisory participant by overseeing, approving, causing, or ratifying the funding, documentation, refinancing, stacking, servicing, and collection practices used to originate and collect the unlawful obligations.

56. Gold Capital and Madison Group functioned as the Enterprise's funding, documentation, servicing, and collection arm. It supplied form MCA agreements, ACH authorizations, guaranties, bank-access demands, UCC/security documents, and payoff structures.

57.     Jaskowlski operates as the solicitation arm of the Enterprise.  Jaskowlski solicits the unlawful debt and acts as the negotiator and front person for the Enterprise's ruses and devices.

58.     Each Defendant shared a common purpose and financial incentive: to fund, refinance, stack, service, and collect high-cost obligations that generated upfront fees, origination charges, finance charges, and fixed weekly collections under the guise of receivables purchases.

### (i)     The Enterprise Principal: Yoel Getter

59.     Getter is a Managing Member of the Enterprise.

60.     He is responsible for the day-to-day operations and success of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

61.     In his capacity principal, Getter is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the weekly payments via ACH withdrawals; and (iii) the form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.

62.     All such forms were used to make and collect unlawful loans including, without limitation, loans extended to Plaintiffs.

63.     As Managing Member, Getter took actions and coordinated, caused, and directed other enterprise associates in furtherance of the overall goals and purposes of the Enterprise,

including, but not limited to the origination, servicing, and unlawful collection of MCA Agreements, the overcollection of funds and exorbitant fees from Plaintiffs' account.

64.    Among other things, Getter executed and signed each of the Enterprise loans at issue, and had direct communications with Plaintiffs regarding each transaction.

### (ii)    The Enterprise Broker:  Jaskowlski

65.    Jaskowlski is responsible for operating the solicitation arm for the Enterprise.  He solicits borrowers and conspires with other MCA brokers to carry out the fraudulent schemes.

66.    In this case, Jaskowlski carried out the "carroting" scheme by soliciting a broker Peter Dunn to act as the go between on the Madison deal.  Specifically, Jaskowlsky called Dunn to refer him the Madison deal and directed Dunn to pitch the Madison deal to Life Star.  Dunn had no knowledge of the carroting scheme and was simply taking the direction and instructions from Jaskowlski, and was promised a commission in exchange.

67.    Getter and Jaskowlski have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members

### (iii)  The Enterprise Companies

68.    Gold Capital and Madison Group maintain officers, books, records, and bank accounts independent of the other Enterprise members ("the Enterprise MCA Companies")

69.    Gold Capital is a New York limited liability company that was formed on April 16, 2021, and is the business of lending.

70.    Madison Group is a limited liability company that has been registered to do business in New York since at least 2021, and is in the business of lending.

71.     Getter has operated the Enterprise MCA Companies as part of an unlawful enterprise to collect upon unlawful debt and to engage in racketeering activity, including the repeated use of interstate wires and electronic banking systems as described herein.

72.     Pursuant to their membership in the Enterprise, the Enterprise MCA Companies have: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's fraudulent and usurious loan transactions, and participation agreements with Investors to fund such loans; (ii) pooled the funds of Investors in order to fund each fraudulent, usurious loan; (iii) underwritten the fraudulent and usurious loans, determining the ultimate rate of interest and repayment structure under each; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the fraudulent and usurious loans; (vi) set up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments and settlements in its name to further collect upon the unlawful debt.

### B.     Collection of Unlawful Debt

73.     The debt Defendants sought to collect and did collect constitute "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) because the debts were incurred in connection with the business of lending money or a thing of value at rates usurious under New York and Florida law and more than twice the enforceable rate.

74.     The debts are unlawful because the agreements were loans, not true receivables purchases. Repayment was effectively absolute; the purchased amounts and debits were fixed; the reconciliation provisions were illusory; the funders did not assume the risk of non-receipt; and the agreements used guaranties, security interests, default provisions, and collection rights to compel repayment.

75.     Defendants collected and attempted to collect unlawful debt through ACH debits, payoff demands, account monitoring, bank-access provisions, UCC/security rights, guaranties, reverse-funding schedules, and related enforcement mechanisms

**C.     Interstate Commerce**

76.     The Enterprise engaged in interstate commerce and used instrumentalities of interstate commerce in its daily business activities.

77.     Defendants used interstate emails, electronic signatures, telephone communications, wire transfers, ACH debits, online bank-access systems, and other interstate communications and banking channels to solicit, underwrite, fund, service, monitor, and collect the unlawful debts.The agreements involved parties and addresses in multiple states, including New York, Florida, Maryland, Connecticut, and other states, and the collection mechanism depended upon interstate banking and ACH systems.

**D.      Injury and Causation**

78.     Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. §§ 1962(c) and 1962(d), including through the collection of unlawful debt, in an amount to be determined at trial.

79.     Plaintiffs' injuries include, without limitation, amounts collected on unlawful debts, improper fees and upfront deductions, ACH and bank fees, coerced payments, impairment of cash flow, interference with bank accounts and receivables, legal fees and costs, and other business losses to be proven at trial.

80.     Because the agreements are criminally usurious loans and unlawful debts, Defendants had no lawful right to collect fixed purchased amounts, finance charges, fees, default

13

amounts, or related collection costs. Plaintiffs are entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

81.     In total, Plaintiffs have paid at least $8,365,000 to which Plaintiffs had no obligation to pay because the debt was void ab initio.

82.     In addition, Plaintiffs have had to incur substantial attorney's fees defending against Defendants' unlawful conduct.

83.     Plaintiffs have further suffered severe reputational harm to goodwill and lost income and profits as a direct result of Defendants' unlawful conduct.

84.     Plaintiffs have also suffered consequential damages by having to take out additional predatory and unlawful debt in order to service Defendants' illegal loans and to maintain business operations.

## COUNT II
### Civil RICO Conspiracy — 18 U.S.C. § 1962(d)

85.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

86.     Getter, Jaskowlski, Gold Capital, and Madison Group agreed to conduct or participate in the conduct of the Enterprise through a pattern of racketeering activity and through the collection of unlawful debt.

87.     Each conspirator knew the general nature of the Enterprise and knew that the Enterprise's objective involved collecting money from Plaintiffs through fraudulent and unlawful means.

88.     Each conspirator agreed that at least one member of the conspiracy would commit predicate acts in furtherance of the Enterprise.

89.     Plaintiffs were injured by reason of the RICO conspiracy.

90.    Plaintiffs are entitled to treble damages, attorneys' fees, costs, and all other relief available under 18 U.S.C. § 1964(c).

## COUNT III
### Fraud

91.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

92.    Getter and Jaskowlski falsely represented or caused others to represent that Plaintiffs should take out an MCA with Madison Group because they would receive the benefit of the early pay discount on the Gold Capital MCA and obtain lowered weekly payments.

93.    At the time of these representations, Getter and Jaskowlski never intended to provide Plaintiffs with the early pay discount.

94.    Instead, Getter and Jaskowlski made or caused these representations to be made in order to deceive and induce Plaintiffs into taking out the Madison MCA to pay off the Gold Capital MCA in full, despite its contractual obligations otherwise.

95.    In furtherance of this scheme, Jaskowlski used Peter Dunn to pitch the Madison MCA so that Plaintiffs would not know that Jaskowlski and Getter were involved.

96.    After the scheme was pitched to Plaintiffs, Jaskowlski and Getter sent Plaintiffs an ACH transfer balance form that Defendants knew falsely inflated the balance by $450,000.

97.    The ACH transfer form was sent by DocuSign and Plaintiffs did not realize at the time they signed it that the amount to be transferred was false.

98.    Immediately after discovering that the amount was incorrect, Plaintiffs called Madison and instructed them not to release the funds.

99.    No funding call occurred and despite Plaintiffs' express instructions not to fund and not to send money to Gold Capital, Madison claimed to have paid Gold Capital $1,820,712, and deposited $750,000, on May 4, 2026.

15

100.    Plaintiffs immediately returned the money deposited to Madison May 6, 2026

101.    Despite returning the money deposited, Madison still asserts that Plaintiffs are responsible for the more than $1,100,000 in interest and the $1,820,712 purportedly paid to Gold Capital.

102.    Defendants orchestrated the scheme to fleece Plaintiffs out of $450,000, while also obligating Plaintiffs to incur over $1,100,000 of additional refinancing debt from Madison.

103.    Plaintiffs reasonably relied upon Defendants' representations in entering into the Madison transaction.

104.    As a direct result, Plaintiffs were damaged in the amount of at least $1,550,000.

105.    Defendants' conduct was willful, malicious, wanton, and undertaken with fraudulent intent, entitling Plaintiff to punitive damages.

## COUNT IV
### Civil Theft

106.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

107.    The Enterprise knowingly obtained or used, or endeavored to obtain or use, Plaintiffs' property with felonious or fraudulent intent to temporarily or permanently deprive them of their right to the property or a benefit from the property.

108.    The stolen property consisted of the $450,000 that belongs to Life Star.

109.    The Enterprise knowingly obtained Plaintiffs' funds by fraud.

110.    The Enterprise acted with criminal intent, fraudulent intent, and knowledge that Plaintiffs had not authorized release of the funds.

111.    The Enterprise's conduct constitutes civil theft under Fla. Stat. § 772.11 and related provisions.

16

112.    The Enterprise's conduct constitutes larcenous and theft-like conduct, including wrongful taking, obtaining by false pretenses, and possession of stolen property, supporting civil remedies, punitive damages, and all available relief.

113.    Plaintiffs have satisfied, will satisfy, or is excused from satisfying any pre-suit demand requirement applicable to civil theft.

114.    Plaintiffs are entitled to treble damages where permitted, plus attorneys' fees, costs, interest, punitive damages, and all other relief available by law.

## COUNT V
## Breach of Contract

115.    Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

116.    On or about March 30, 2026, Gold Capital entered into an MCA agreement with Lifestar Capital LLC. The stated purchase price was $1,500,000; the stated purchased amount was $2,175,000; the stated purchased percentage was 40%; and the weekly remittance was $103,571.42.

117.    On or about March 30, 2026, Gold Capital also executed a prepayment-discount addendum for the Lifestar Capital LLC transaction. The addendum provided that if the transaction were paid within 30 calendar days, the rate would adjust to 1.15 and the payoff would be $1,725,000; if paid within 45 calendar days, the rate would adjust to 1.20 and the payoff would be $1,800,000; and if paid within 60 calendar days, the rate would adjust to 1.25 and the payoff would be $1,875,000.

118.    Gold Capital's own payment history for Life Star reflected a starting balance of $2,175,000 on April 14, 2026 and showed that by May 4, 2026, after payments and returned ACH entries, the balance was $1,820,712.

17

119.    On or about May 1, 2026, Madison Group entered into a new MCA agreement with Life Star Living LLC. The stated purchase price was $2,750,000; the stated purchased amount was $3,850,000; the stated purchased percentage was 20%; and the weekly remittance was $183,333.33.

120.    On or about May 1, 2026, Madison Group issued or caused Life Star to execute a "Balance Transfer Agreement" concerning Lifestar Capital LLC. The letter stated that Life Star agreed to pay off the remaining RTR of $1,820,712 that existed on the previous Gold Capital merchant agreement entered into on or about March 30, 2026 from the funds Life Star was receiving from the new Madison Group merchant agreement dated May 1, 2026.

121.    By that balance-transfer document, Madison Group caused Life Star to authorize Madison Group to deduct $1,820,712 from the new Madison Group merchant agreement.

122.    The Madison Group transaction was therefore not a bona fide purchase of future receivables in the ordinary course. It was a refinancing or balance-transfer transaction designed to use new proceeds to pay off an existing Gold Capital debt, while adding approximately $1,100,000 in new charges under the Madison Group agreement.

123.    At the time Madison Group deducted $1,820,712 for Gold Capital, the March 30, 2026 Gold Capital transaction was within the period governed by the early-pay discount addendum. The payoff should have been reduced to the discounted amount provided in that addendum to $1,370,712.

124.    The Enterprise instead caused Madison Group to deduct the full $1,820,712 balance for Gold Capital and failed and refused to give Life Star the benefit of the $450,000 early-pay discount or refund the overpayment.

125.    The Enterprise used the promised discount as the "carrot" to induce Life Star into the Madison Group transaction, while knowing or intending that Life Star would not receive the discount and that the Enterprise would collect the full undiscounted Gold Capital amount and the new Madison Group return.

126.    Plaintiffs have been damaged in the amount of at least $450,000, as well as consequential damages of at least $1,100,000.

## DAMAGES

211.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages including, without limitation:

 a) $450,000 in wrongfully released and converted funds;

 b) loss of use of funds;

 c) criminally usurious interest paid;

 d) consequential business damages;

 e) costs of investigation;

 f) attorneys' fees and litigation expenses;

 g) prejudgment interest;

 h) damage to business operations and liquidity; and

 i) punitive and exemplary damages.

212.    Plaintiff is entitled to treble damages under RICO and, where applicable, civil theft statutes.

213.    Plaintiff is entitled to attorneys' fees and costs under 18 U.S.C. § 1964(c), applicable civil theft law, and any other applicable statute, rule, agreement, or equitable doctrine.

19

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demands judgment against Defendants as follows:

i.   On Count I, against Getter, Jaskowlski, Gold Funding, Madison Group, awarding treble damages under RICO, attorneys' fees, costs, interest, and all other relief available under 18 U.S.C. § 1964(c);

ii.  On Count II, against Getter, Jaskowlski, Gold Funding, Madison Group awarding treble damages under RICO, attorneys' fees, costs, interest, and all other relief available under 18 U.S.C. § 1964(c);

iii. On Counts III through V, awarding compensatory damages in an amount to be proven at trial, but not less than $1,650,000;

iv.  Awarding treble damages where permitted by law;

v.   Awarding punitive and exemplary damages;

vi.  Awarding prejudgment and post-judgment interest;

vii. Awarding attorneys' fees and costs;

viii. Imposing a constructive trust and/or equitable lien on all proceeds traceable to Plaintiffs' $1,650,000;

ix.  Ordering disgorgement and restitution of all funds wrongfully obtained from Plaintiffs;

x.   Awarding injunctive relief requiring Defendants to preserve all records, bank accounts, communications, and proceeds related to the $450,000; and

xi.  Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
    May 30, 2026

                        HESKIN & PROPER, PLLC

                        By: /s/ Shane R. Heskin
                        Shane R. Heskin
                        641 Lexington Avenue, 14th Floor
                        New York, New York 10022
                        (917) 362-1313
                        shane@heskinproper.com
                        *Attorney for Plaintiffs*